AMERICAN GUARANTY LIFE, HEALTH AND ACCIDENT INSURANCE COMPANY, Appellant,

v.

STATE of Texas, Appellee.

No. 10729.

Court of Civil Appeals of Texas.

Austin.

Feb. 3, 1960.

Rehearing Denied Feb. 24, 1960.

David L. Tisinger, Warner A. Hancock, Austin, for appellant.

Will Wilson, Atty. Gen., James H. Rogers, Asst. Atty. Gen.; Robert L. Burns, Houston, of counsel, for appellee.

HUGHES, Justice.

This is a condemnation proceeding brought by the State of Texas acting by and through the State Building Commission for the purpose of condemning and taking property owned by appellant, American Guaranty Life, Health and Accident Insurance Company, in Travis County for use as a site for a State office building.

Special Commissioners appointed by the County Judge of Travis County awarded appellant the sum of $146,000 for the taking of such property. This amount was paid into the registry of the County Court and distributed by order of the court in a manner not in dispute here.

The State filed objections to the award made by the Special Commissioners and the cause came on for trial before the court below aided by a jury. The jury found that the property taken by the State had a value of $129,500 at the time of taking. Based upon this finding an appropriate judgment was entered including a money judgment against appellant for $16,400, being the difference between the amount distributed in accordance with the award of the Special Commissioners and the value found by the jury.

Appellant has twenty-five points of error, the first four of which are grouped for briefing. These points complain of the court's action in not permitting his expert value witness C. T. Uselton to testify to (a) the sale price of property located at 12th and Guadalupe Streets in 1946 (b) the sale price of property located at 17th and Lavaca Streets (c) the square foot value of the Shelton property sale on 15th Street (d) the witness's square foot value of the Castleman Estate property.

The subject property fronts 160.17 feet on San Jacinto Street, 160.17 feet on Brazos Street and 128 feet on 12th Street. It was vacant property and contained approximately 20,500 square feet.

Without being specific, the objections to the excluded testimony were that the sales

were too remote, not of property similar to the subject property and that of hearsay.

The record does not show what answers the witness would have given to any of the inquiries made of him except that he testified that the property at 12th and Guadalupe sold for "Twenty-seven-five." The jury was instructed to disregard this testimony.

■ Where an objection to a question is sustained in interrogating a witness on direct examination and the record does not disclose what answer the witness would have given there is nothing for the appellate court to review. McCarthy v. City of Amarillo, Tex.Civ.App., 307 S.W.2d 595, Austin Court of Civil Appeals.

■ Regarding the property at 12th and Guadalupe Streets, Mr. Uselton testified:

"Q. For appraisal purposes, in your opinion, were these sales comparable to the property in question, the property involved in this lawsuit? A. To a degree, yes, sir.

"Q. From a standpoint of ascertaining how the market values in the Capitol area have gone up or down, is it comparable? A. Yes, sir.

"Q. Tell us, in your opinion, how that property increased in value.

\*      \*      \*      \*      \*      \*

"Q. Approximately what are the subsequent dates that you have in mind, Mr. Uselton, just the dates? A. About 1946.

"Q. Is that the last one? A. No, sir.

"Q. What is the one after it? A. About 1952.

\*      \*      \*      \*      \*      \*

"Q. Is the '52 transaction the last one involving that property that you are thinking about? A. Yes, sir.

"Q. In your opinion, do the sales you have in mind of the property at 12th and Guadalupe between the period of 1946 and about 1952, do they indicate to you, as an appraiser, a change in value? A. Yes, sir.

"Q. And have you used that in your mind as a basis for saying that property in this area has been increasing generally in value? A. Yes, sir.

"Q. What increase in value, then, did you notice with respect to that property?

\*      \*      \*      \*      \*      \*

"A. It more than doubled.

"Q. What did it go for in '46, about? A. Twenty-seven-five."

We quote from appellant's brief its argument on this point:

"Nearness in time as a qualification for admissibility is made in recognition of the commonly known fact that the status of the general economy, either depressed or inflated, is not a static condition but one of change. It was for the purpose of proving a change in the general economy and the extent of the influence of such a change on property values in the locality that appellant endeavored to secure the sales data of the 1946 sale and subsequent sales. This testimony was not offered as direct evidence of the terms of the sale made in 1946, but such sale had been investigated by the witness as part of the factual background of his testimony and was properly admissible for that purpose."

It seems to us that the purpose for which appellant states that this testimony was offered was achieved when the witness was permitted to testify that the property at 12th and Guadalupe Streets had more than doubled in value between the years 1946 and 1952.

In any event we hold that the Trial Court did not abuse his discretion in excluding a

1946 sale in a 1959 trial since the elapsed time, 13 years, is so great as to render the excluded evidence reasonably subject to the objection that it was not a recent but a remote sale.

■ Points five through nine are grouped by appellant for briefing. They complain of the exclusion from evidence of (a) testimony of the witness Morris G. Cook as to the adaptability of the property to a particular use and a brochure showing proposed buildings which would have been placed on the property (b) testimony by the witness Uselton that but for the condemnation proceedings someone by this time would have put an office building on the property (c) testimony that $15,000 had been spent in architect's fees which was one fourth of the fees agreed to be paid for constructing a building on the subject property (d) testimony that 90% of the space in the proposed building had been leased prior to receiving notice of the intention to condemn (e) testimony that appellant had plans for a building on the property condemned.

Mr. Uselton testified:

"Q. What did you determine the investor would probably want to put there? What is the best use you could make of that property? A. Well, after taking the property and analyzing it and studying it from every angle, it is a—could be definitely considered as a multi-purpose location for many varied types of developments, but as taken, and considering any numbers of developments that would be best suited for that particular location, there were two in particular that I centered on. One was an apartment hotel; the other was a business building, office building. The latter was the one I finally accepted.

"Q. If I understand you, you determined that an office building would be the best use in your mind that an investor could make of this property? A. In my own opinion, it was, yes, sir.

*   *   *   *   *   *

"Q. Now, did you tell us yesterday what you thought this property could best be used for? A. Yes, sir.

"Q. What? A. Commercial, office building.

"Q. Did you figure out what it would cost to put, say, a ten-story building on this property? A. Yes, sir.

"Q. And did you figure out what it would cost to put, say, a twenty-story building on this property? A. Yes, sir.

"Q. Did you add up all those costs, and after having done so, figure out what your income should be from each building? A. Yes, sir.

"Q. And did you figure interest on the investment that would have to be allocated by reason of having paid out that kind of money to put it in buildings on the property? A. Yes, sir.

"Q. And did you allow for depreciation and all those things? A. Yes, sir.

"Q. Expenses of upkeep and vacancy losses and all those things? A. Yes, sir.

"Q. And then did you figure what a person's net returns would be on his investment if he paid $250,000 for this property—A. Yes, sir.

"Q. —for the land, I mean? A. Yes, sir.

"Q. What would his return be, net return?"

Objection was made to the last question and counsel for appellant withdrew the question.

Mr. James C. Cochran, a witness for the State, on cross examination testified:

"Q. Mr. Cochran, you, as a real estate man, know that this property, devoted to its highest and best use, would

be probably used as an office building site; do you agree? A. I would think so, yes, sir."

Mr. Tom Graham, also a witness for the State, testified on cross examination:

"Q. Don't you think the highest and best use of this property involved in this lawsuit would be to put a multiple-story office building on it? A. Yes, sir."

We do not find the brochure, referred to above, in the record but it is described as "a brochure with an architect's drawing of a multi-story office building located on the property involved with the name of 'American Guaranty Underwriters Building' beneath, giving a street address for the location and bearing the architect's name."

Regarding this brochure the witness Cook offered to testify:

"Q. And it does represent a use that your people thought could be made of the property? A. Yes, sir; they do.

"Q. Is it a fact or is it not, that 90% of the space in this building had already been leased? A. Yes, sir, that is a fact, my knowledge.

"Q. And had you or had you not determined that the building would amortize itself? A. Yes, sir. It had been determined."

Mr. Jack Millard, president of appellant company, offered to testify that $15,000 in architect's fees had been paid in connection with the proposed office building and that this was one fourth of the anticipated outlay for architects' fees for such building.

Out of the presence of the jury Mr. Uselton testified:

"Q. Mr. Uselton, we are not supposed here to consider the fact that the State wants this property or wants to condemn this property in fixing value; and excluding that from your mind, I want to ask you if the property were not being condemned, if in your opin-

ion, by this time somebody would have put an office building on the property? A. Yes."

This testimony was objected to on the ground that it was "pure conjecture" and the objection was sustained.

Appellant cites 16 Tex.Jur. 565 for the rule that not only the actual use made of property sought to be condemned but also any use to which the property is adapted and might be put, should be taken into account in estimating its market value. The same authority, 16 Tex.Jur. 570, states that the above rule does not make admissible evidence of intended future use of the property by the owner, this on the ground that such evidence opens a field too speculative and uncertain and does not afford the condemning authority a fair opportunity for rebuttal. See also Texas Power & Light Co. v. Hill, Tex.Civ.App., 27 S.W.2d 842, Austin Court of Civil Appeals, writ dismissed.

We believe that the record above recited demonstrates that the Trial Court gave to appellant full benefit of the rule allowing it to show adaptability of the subject property for a particular use and that the evidence excluded was properly excluded as being in violation of the rule forbidding admission of evidence of intended use by the owner.

We also believe that if the excluded evidence was within the realm of discretionary authority of the Trial Court to admit or reject it, that his discretion was properly and prudently exercised.

Referring for a moment to the missing brochure and the payment of architect's fees, if these matters had been admitted then they would have been subject to rebuttal testimony and the trial would have degenerated into a trial of controversial collateral issues.

We believe this is what the Court had in mind in City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808, 816, when it stated: "A witness may give his opinion of the present market value of the land, tak-

ing into consideration its adaptability to subdivision for residential and commercial purposes and the cost of converting it to such uses, but inquiry into the details or mental processes by which the witness arrives at his conclusion is only proper on cross examination for the purpose of testing the credibility of the witness or for laying a predicate for impeachment."

Points five through nine are overruled.

Appellant has also grouped for briefing points ten through thirteen. They are that the Court erred in (a) not permitting the witness Cook to testify as to appellant's investment in the property (b) in permitting the State to cross examine the witness Jack Millard and prove by him the recapitalization of appellant (c) in not permitting the witness Calvin Huffman to testify to the circumstances surrounding the sale from Buckner's Orphans Home and (d) in not permitting appellant to prove that Bullard was in an economic squeeze when he sold the subject property to appellant.

(a) The witness, Morris G. Cook, was asked by appellant "How much did Underwriters invest in this property." He attempted to answer saying "I understand a hundred and * * *" when an objection was made and sustained. The answer of the witness is not brought forward and there is nothing for us to review. Authorities supra.

■ As to (b) Mr. Millard, appellant's president, was asked if he had sought an amendment to the articles of incorporation of the appellant company before the Insurance Board and if a hearing had been held on such application and he answered "Yes."

This question was asked by the State as a predicate to the admission of evidence which the Court excluded. We are unable to attach any significance to the question

and answer and we doubt that the jury did. In our opinion more harmless error could not be committed.

■ (c and d) Mr. Calvin C. Huffman was president of American Guaranty Underwriters, the immediate predecessor in title of appellant to the subject property. He was called as a witness by the State to testify to the sale price of the property when it was purchased in 1955 from Lester Williams.[1] This price was stated to be $110,000. On cross examination Mr. Huffman, in the absence of the jury, was questioned and offered the following testimony:

"Mr. Bullard had contracted to buy a piece of property down on 7th Street, a piece of property now that the Capital National Bank is building a parking ramp on; and it had been his understanding that he had a sale on that when he bought our piece of property; but that sale didn't develop. Consequently, he was like a man caught in the middle of a fence astraddle of it and didn't know which way to go, and since the other party wasn't relinquishing his rights in the contract, he had to give up this property. * * * So I got a real bargain; and Mr. Burns is attempting to show here that the hundred thousand dollars that was reflected in the record is a fair market value for that property, which is not the case. We got it, you might say, on a real 'steal.'"

This testimony was excluded on the ground that it was hearsay. We concur in this ruling.

We overrule points ten through thirteen.

■ Points fourteen through eighteen are grouped for briefing. They assert error in (a) refusing to permit appellant to prove by the witness Uselton that no other

1. Mr. Huffman testified that the property was purchased by his company from Lester Williams. He also testified that his company had agreed to buy the property from Buckner's Orphan Home but prior to such purchase it was sold by the Home to Mr. Williams and Mr. Bullard.

property comparable to the subject property was available on the market adjacent to the State Capitol (b) refusing to permit counsel for appellant to argue the substance of (a) to the jury (c) excluding from jury consideration the following argument:

"Mr. Tisinger: There is one thing I think is important and you should especially consider it. Assuming that the State were not buying up all this land, even so, where could this property owner for the kind of money they are talking about duplicate property of this size and this location and this value? Where could we go? They haven't told you."

Upon such exclusion counsel for appellant made this statement:

"Note our exceptions. Your honor, I want to stay with your honor's ruling and I hope that I have as I am sincerely trying to. I thought I did awhile ago. But I am telling this jury that there is no testimony here that we could get property comparable to this for the kind of money they are talking about."

(d) Refusing to permit appellant to cross examine the State witness James C. Cochran as to where appellant could replace this property and (e) refusing to permit the same witness to be questioned by appellant as to where there was another piece of property of equal size and equally close to the State Capitol.

The record shows that Mr. Uselton did answer "No, sir, I don't know of any" to the question "is there any like property adjoining the Capitol on the market?"

The record also shows that the witness Cochran testified:

"Q. Now, where could I put an office building this close to the Capitol on property of equal size? A. I believe there—you would have to define whether you are touching the Capitol grounds or a particular building.

"Q. Talking about this close to the Capitol grounds. A. I would have to check the territory to find out what is available.

"Q. You know, as a matter of fact, there is not any available, don't you? A. No, sir, I don't know it."

The witness Cochran was asked these questions by counsel for appellant:

"Q. Where could my people replace this property with property of equal size this close to the Capitol that you mentioned?

\* \* \* \* \* \*

"Q. Mr. Cochran, is there another piece of property on the market of equal size to this property and equally close to the Capitol?"

Objections to these questions were sustained and the record does not, except as shown by the testimony of Mr. Cochran, supra, disclose what answers the witness would have given to such inquiries.

If, as we believe, Mr. Uselton gave testimony in substance similar to that which was rejected on objection there could be no harm occasioned by not allowing repetition. We also hold that error is not reflected because the answers to the objectionable questions are not in the record. Authorities supra.

The same ruling is made as to appellant's complaints regarding restriction of his argument to the jury. The record is silent as to these matters.

Points fourteen through eighteen are overruled.

Grouped points nineteen, twenty one and twenty two are that the Court erred in (a) admitting the testimony of the State's witness Frank Kuhne as to the purpose of Austin Savings and Loan in buying tract "D" (b) in refusing to permit the witness Calvin Huffman to testify that the

subject property had a market value of $215,000 in the Spring of 1958, the time of taking, and that this was the appraised value of the property made by the City of Austin; and (c) in refusing to permit Mr. Huffman to testify that the value of property across the street was $120,000.

■ (a) Mr. Uselton, for appellant, had testified that on June 28, 1958, the "Rather" Estate conveyed a tract of land at 1006 Lavaca Street, having a frontage of 68.67 feet and depth of 134 feet, to the Austin Savings & Loan Association for $102,500, or $10.95 per square foot. He testified that the property was improved with an old, two-story red brick building which was destroyed by the buyer and the property used as a parking lot. He also testified that on buying this property, the Austin Savings & Loan Association entered the parking lot business, rented parking spaces on the lot, and that the lot was not used solely for its officers. He pointed out that the Association owned property "back here" and had a parking lot on 10th Street and that it did not have to buy "to build a building on it to expand their building facilities."

Mr. Frank Kuhne, real estate appraiser and Building Manager for Austin Savings & Loan Association was called by the State to rebut the testimony of Mr. Uselton. He testified he had been with the organization eight and one half years, that the area between the Rather property and their building at 11th and Lavaca was used as a parking lot for the organization and the tenants in the building and that he knew of his own knowledge that the Austin Savings & Loan had plans for expanding its building onto the parking lot and that the Rather property was bought to have a parking lot adjacent to the expanded building. Mr. Kuhne also testified that the association had plans to expand its building for its own use and could only expand it to the south over its existing parking lot, and the Rather property was purchased to have a parking lot adjacent to the expanded building. He further tes-

tified that the project was under way at the time of his testimony.

The objections to this testimony were that the best evidence rule applied and that it was in the nature of a conclusion.

■ The witness was in a position to know the truth of the matters about which he testified and he stated that they were within his own knowledge. The best evidence rule is inapplicable to collateral transactions such as these were. 2 McCormick and Ray, Texas Law of Evidence, Secs. 1567–8.

The distinction between facts and opinions or conclusions is evanescent and we will not attempt a definition of the terms, an "almost impossible" undertaking. 2 McCormick and Ray, supra, Sec. 1394.

We do hold, whether facts or conclusions, that the evidence is admissible because within the knowledge of the witness and is factual or opinion evidence in the nature of a shorthand rendering of the facts. 2 McCormick and Ray, supra, Sec. 1397.

■ (b) While the Court was permitting counsel for appellant to make a bill of exceptions in the absence of the jury regarding the testimony of Mr. Huffman to the effect that the sale by Williams or Williams and Bullard to American Guaranty Underwriters was made under economic pressure the witness was asked what, in his opinion, would be the reasonable market value of this property as of the Spring of 1958 and he answered $215,000 and then volunteered a further statement "That is what the City said they appraised it for."

The testimony was not pertinent to the bill which counsel was being allowed to make. It was never offered in evidence and the Trial Court did not rule on its admissibility and its admissibility is not before us for decision.

■ (c) The witness Huffman testified "that the property directly across the

**144**

street just south of that was valued at $120,000 and was priced for sale at that." This point, therefore, has no predicate.

Points nineteen, twenty one and twenty two are overruled.

 The twentieth and twenty third points of error are that the Trial Court erred in (a) refusing to permit proof of the amount of ad valorem taxes paid on the subject property (b) in refusing to permit appellant to prove loss of expenses such as architect's fees incurred before notice of condemnation proceedings.

 (a) Since ad valorem taxes are, as the name implies, based on value of the property taxed the amount of the taxes paid would be meaningless in determining value unless the rate was known. Furthermore the law is that tax assessments or renditions made by others than the owners of the property are inadmissible on the issue of value. City of Houston v. Priester, Tex.Civ.App., 302 S.W.2d 948, Galveston Court of Civil Appeals.

 (b) We have discussed this point under point seven and the ruling there made is applicable here. We also concur in the observation made by the Trial Court in excluding this evidence that while it is relevant on the issue of value to show adaptability of the property to its best use it is not relevant to such issue to prove the cost of reaching the conclusion as to such adaptability.

Points twenty and twenty three are overruled.

The last points are twenty four and twenty five. They are that (a) if no single error requires reversal then the cumulation of errors does and (b) the verdict of the jury is manifestly unjust in failing to award appellant adequate compensation.

(a) We overrule this point on the ground that few, if any errors were committed in the trial of this case.

 (b) The following summation shows the value put on the subject property by each witness who testified thereto:

| "Name of Witness | Value Opinion |
|---|---|
| "Appellant's Evidence: | |
| C. T. Uselton | $250,560.00 |
| "Appellee's Evidence: | |
| Forest Pearson | 123,500.00 |
| James C. Cochran | 129,318.00 |
| Tom Graham  'Approximately | 130,000.00' |
| Rickey Key (Adverse witness) | 165,000.00" |

We hold that the sum of $129,500 found by the jury to have been the value of the property condemned at the time of its taking is not manifestly unjust under the evidence.

The judgment of the Trial Court is affirmed.