STATE of Texas, Appellant,

v.

Ethel HARTMAN, Appellee.

No. 10793.

Court of Civil Appeals of Texas.

Austin.

July 13, 1960.

Rehearing Denied July 27, 1960.

Will Wilson, Atty. Gen., James H. Rogers, J. Arthur Sandlin, Asst. Attys. Gen., for appellant.

F. L. Kuykendall, Austin, for appellee.

HUGHES, Justice.

This is a condemnation suit brought by the State of Texas to condemn the east 54' of Lots 11 and 12, Block 172, Original City of Austin, owned by appellee, Mrs. Ethel Hartman, a widow, for use as a site for an office building for the Texas Employment Commission.

The only issue in controversy is the value of the property.

Trial to a jury resulted in verdict and judgment fixing the value of the land taken at $44,712 ($9 per square foot) which amount exceeds the value placed upon it by the Special Commissioners by $10,712. The award of the Commissioners was not acceptable to appellee.

█ The State's first two points are that there is no evidence to support the verdict of the jury, and that the verdict of the jury is so against the overwhelming weight of the evidence as to be manifestly unjust.

Mr. Joe Crow, witness for appellee, testified that he had been in the real estate business in Austin since 1939, and had bought and sold real estate, both residential and commercial; that he had developed subdivisions, and had engaged in all phases of real estate activity, and had acted as a broker for both sellers and buyers.

Mr. Crow discussed trends in the value of real estate, and the influence of supply and demand upon the market value of property. He gave a description of appellee's property from a personal inspection of it, and from a consideration of various facts, including its proximity to the State Capitol Building, he stated that, in his opinion, it had a market value at the time of taking, March 21, 1958, of $60,000.

Mr. C. T. Uselton also testified for appellee. He stated that he had lived in Austin since 1929 and had been a real estate man, builder and appraiser for twenty five years.

He inspected and appraised appellee's property and gave his opinion that it had a market value of $61,000 to $62,000. This witness had testified to a higher value based on matters, later mentioned, not properly relevant to market value.

Appellee, Mrs. Hartman, testified that she bought the subject property, which was located one block from the State Capitol Building and seven blocks from downtown Austin, in 1946; that it, the house, was divided into eleven apartments, with seven baths and a shower. She testified that her net income from these apartments during the five years, 1953 to 1957, was $7,259.90, and in addition she testified that she occupied four rooms and a private bath, the rental value of which was $75 monthly.

Mrs. Hartman testified, in her opinion, the property had a market value of $100,000.

Mr. Harold Legge, a witness for the State, testified, in his opinion, that the property had a value of $29,850.

Appellee's land contains 4,968 square feet. It fronts 52' on the north line of East 14th Street and 92' on the west line of Brazos Street. The land is level and is only slightly above the grade of the streets. The improvements consist of an old, two story frame residence and garage. The house was in poor condition as a result of the burning of the Pruitt house next door.

Appellee's property is located at the corner of Brazos and 14th Streets in the area behind the Capitol lying between the thoroughfares of Lavaca and San Jacinto Streets. Both Brazos and 14th Streets are paved but carry very little traffic. The Capitol grounds stand as a buffer between continuous flow of traffic from downtown Austin to the intersection of 14th and Brazos Streets.

Very few properties just north of the Capitol between Congress Avenue and San Jacinto Street are used for any thing other than uses residential in character. In appellee's block, all properties other than a church and doctor's clinic were improved with old frame residences. In the block to the south, between 14th and the Capitol and Congress and Brazos all properties are improved with old residences except that fronting on Congress. The block immediately to the east, bounded by Brazos, 15th, San Jacinto and 14th, was filled with old residence buildings, all but one of which have been removed. All properties on the block bounded by 14th, Brazos, 13th and San Jacinto Streets, except the State Power Plant and a remodeled residence, were occupied by old residence buildings. The blocks north of the 15th between Congress and San Jacinto Streets are similarly improved.

The only office building development behind the Capitol has been in the area west of Congress Avenue.

Mr. Crow and Mr. Uselton testified that use of the property for an office building would be desirable. This would require destruction of the house, which they valued at $10,000 and $13,440 respectively. Mr. Harold Legge, a witness for the State, gave the house a value of $5,000. These appraisals were made before the house was damaged by fire and water.

Appellee's property is in a C Commerical and Third Height and Area Zone under the Zoning Ordinance of the City of Austin. All property in these zones must provide 180 square feet of parking space, plus egress and ingress area, for every 300 square feet of floor area of an office building and every 200 square feet of floor area of a commercial building. Mr. Crow, on voir dire examination, testified that this factor should

be taken into consideration in determining the best use of the property.

Mr. Legge, testifying about neighborhood property, stated that 49.6% was zoned commercially, 11.4% used commercially, 50.3% zoned and 63.5% used residentially.

Appellee rendered her property to the City of Austin for tax purposes for the years 1956 and 1957, land $7,250, improvements, $6,450. The city renders on approximately 75% of true value.

The county tax rendition by appellee for the years 1955, 1956 and 1957 was $5,710, the county rendering on about 20% of true value.

From appellee's income tax returns for the years 1953 through 1957, the following is shown:

| "Year | Gross Income 1 | Operating Expenses 2 | Net Income (Excluding Deprecia-tion) | Value On Capitali-zation At 6% Per Annum | Depre-ciation | Net In-come or (Loss) |
|---|---|---|---|---|---|---|
| 1953 | $3,367.14 | $1,882.45 | $1,484.69 | $24,745.00 | $1,401.61 | $ 82.08 |
| 1954 | 2,942.50 | 1,824.79 | 1,117.71 | 18,628.00 | 1,401.61 | (283.90) |
| 1955 | 2,986.25 | 1,658.20 | 1,328.05 | 22,136.00 | 1,401.61 | ( 73.56) |
| 1956 | 3,162.40 | 1,611.82 | 1,550.58 | 25,843.00 | 1,149.05 | 401.53 |
| 1957 | 3,136.00 | 1,465.71 3 | 1,670.29 | 27,838.00 | 840.87 4 | 829.42 |
| | | | | $25,838.00 | | |

Average
1. Includes income produced by furniture.
2. An item for the expense of management is *not* included.
3. Listed as 10/11 of total expenses.
4. This figure represents 10/11 of the total figure, $924.95."

---

Appellee testified in the hearing before the Special Commissioners that the gross income for the apartment house was $3,400 per annum. By deposition she testified that her net income was over $200 per month.

Appellee claimed property owned by her on West Avenue as her homestead for the years 1955 and 1956. In 1957 the property in suit was claimed by her as a homestead.

The telephone directory for the City of Austin showed the address of appellee for the years 1955 and 1956 to be on West Avenue and for 1957 to be the subject property.

The following sales of comparable property are shown:

To the First Baptist Church in early 1955:

1. 200 East 14th, Northeast corner of 14 and Brazos, 46 feet on 14th and 128 feet on Brazos, from Monroe Hagen, for $22,500 or $3.82 per square foot. (Across Brazos from appellee's property.)

2. The next place east on 14th, 49.4 feet on 14th by 128 feet depth, from Mr. Brown for $21,000 or $3.32 per square foot. This property was improved by an old, one-story frame residence with a two-room house on the rear.

3. The next property to the east, fronting 90 feet on 14th St. and having a depth of 128 feet from Louise Barnett for $33,000 or $2.86 per square foot.

4. Corner of 14th and San Jacinto, 90.5 on 14th and 128 feet on San Jacinto, from Harry Pruitt for $51,500 or $4.45 per square foot.

5. Corner of 15th and San Jacinto from J. E. Roberts for $50,000 or $4.25 per square foot.

6. The Shelton property (on 15th Street) cost the church $57,500 or $9.76 per square foot. This property was improved by a four unit, two-story apartment house in a good state of repair. Mr. Riley offered the Sheltons $60,000, which they rejected, and then he obtained an option on other property for $57,500 and traded it to them for the property on 15th street. He testified that the Sheltons were unwilling to sell and were holding out.

7. The vacant lot on 15th adjacent to the Shelton property sold by Mr. Sanford for $15,000 or $2.55 per square foot.

8. The Wroe property fronting on the east side of Brazos and adjacent to the alley sold for $15,000 or $2.55 per square foot and was improved by a frame residence.

Mr. Vance Riley, who testified to the above sales, stated that the fact that they were made to a church was not a factor in the prices paid.

Mr. Uselton testified that the southwest corner of 15th and Brazos Streets, 3,726 square feet, sold for $35,000 or $9.6 per square foot. There is some question as to whether or not $18,000 in improvements were put on the property before or after the sale.

Property on the west side of Lavaca, between 11th and 12th Streets, containing 9,840 square feet was sold by Searight Estate to the Insurance Company of North America, February 15, 1956, for $100,000 or $10.16 per square foot. The Insurance Company owned adjacent property which it used for parking purposes.

Property on the east side of Lavaca, containing 6,400 square feet, was sold to Cook Funeral Home for $67,500 or $10.55 per square foot. The property was acquired for a parking lot.

11,040 square feet at Guadalupe and 11th Streets was sold to Lowich Investment Corporation in March, 1953 for $8.11 per square foot.

Mr. Uselton, regarding the sales to the Baptist Church, testified that one of the vendors told him the price was lowered because a church was involved.

It is our opinion that both points under consideration should be overruled.

As to the no evidence point, it is sufficient to say that three qualified witnesses expressed opinions as to the value of the condemned property.

"Opinion is not only the most satisfactory but often the only available evidence as to value. In fact it is difficult to see how value could be proved without opinion evidence." Sec. 1422, McCormick and Ray, Texas Law of Evidence, Vol. 2, 2d Ed.

In American Guaranty Life and Health Ins. Co. v. State, Tex.Civ.App., 332 S.W.2d 135, writ of error refused, N.R.E., we upheld, at the instance of the State, a jury verdict of $129,500 as not manifestly unjust where the Special Commissioners had awarded $146,000 and the highest appraisal was $250,560, and even though a witness for the State testified to a higher value than the jury found.

We also cite our opinion in State v. Haire, Tex.Civ.App., 334 S.W.2d 488, writ of error refused, N.R.E., where we sustained a jury finding in excess of $10 per square foot of similar property in the same vicinity as the subject property, and where some of the witnesses as to value and factors affecting value were the same as here. Despite the State's disparagement of the sale of the Shelton property, we are convinced that it furnishes a valid basis for opinion evidence and for the jury verdict. The fact that the owner of this property did not accept the price offered him,

which labeled him a holdout, is nothing more, it seems to us, than to ascribe to him the qualities of a shrewd business man and to prove that he was a better trader than those who were willing to sell to the church for lesser sums. There is no evidence that the church was compelled to buy this property or that the exchange effected was not free and voluntary. In our opinion, the jury was well within its sphere of weighing all the evidence in recognizing, if it did, the force and effect of this sale upon market values.

We have considered all the evidence and have set out all the evidence upon which the State relies to sustain these points, and we find that there is evidence of probative value to support the verdict of the jury, and that such verdict is not so against the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust.

■ Points three, four and five are jointly briefed. These points are directed to the admissibility of the opinion evidence of appellee's witnesses Crow and Uselton, it being asserted that the testimony of Crow should have been stricken because his opinion was based upon the acquisition of the subject property as a part of a theoretical assemblage of property north of the Capitol and that the testimony of Uselton should have been stricken because (1) the witness admitted that he had considered the enhancement in value of the property due to the State's land acquisition and building program and (2) he did not consider this property as being offered for sale by a willing seller.

Mr. Crow testified, partly on voir dire and out of the presence of the jury:

"Q. Now, with that refreshment, may I ask again whether or not your appraisals of the Pearson, Nichols, and Parrish properties employed a similar process to that you used here, of assuming a purchaser coming in to purchase the individual property as a part of an assemblage of properties?

A. My thinking changed considerably as a result of my being informed by my attorneys that the process of thinking in terms of an assemblage could not be used in this case; that I was to approach it and be sure that I entirely severed my thinking from the State of Texas purchase; and also that I severed my thinking from what would be comparable to a purchase by the State of Texas, and come up with a value separate and apart from that type of thinking. After their instructions, I have made the best attempt of which I am capable to appraise the property without having as a basis the assembly factor, whether it be the State, or anyone else.

\*    \*    \*    \*    \*    \*

"Q. All right. With no intimation that we are interpreting that as being the same thing as the State of Texas, will you answer this question for me so that we can try to quit: Does the opinion of value you expressed today depend at least in part on your assuming a hypothetical purchaser completely unrelated to the State of Texas coming in to purchase the Hartman property as a part of an assemblage of a tract of two or three blocks of ground?

\*    \*    \*    \*    \*    \*

"Q. And I will ask you whether or not further if you have not also considered as part of your appraisal an assemblage of more than one piece of property, such as a block or more of property?. A. Of a block or more of property?

"Q. Yes. A. No, sir.

"Q. You did not consider that in making your $60,000 appraisal? A. For the purposes of this Court right here, I did not.

\*    \*    \*    \*    \*    \*

"Q. All right. Now,—and at the same time, ceasing to use that assemblage factor, and ceasing your

thinking of this in terms of buying a whole block of property, but just buying the one Hartman tract, you still think that the value would be the same? A. I think the valuation of any property in that area would be about $10.00 a square foot, on the land value."

The State relied upon some answers given by this witness in the proceeding before the Special Commissioners, and some vague and inconclusive testimony on cross-examination on this trial.

In view of the positive testimony of the witness, quoted above, that his opinion as to value was not based on the assemblage of property theory, we hold that the Trial Court properly exercised his judicial discretion in permitting this witness to give opinion evidence as to value of this property. Sec. 1401, Texas Law of Evidence, Vol. 2, Second Ed., McCormick and Ray.

As to Mr. Uselton, it is true that he put a valuation upon this property of $73,056, and that he took into consideration value resulting from the State's building program. Mr. Uselton then testified:

"Q. Well, about how much increase would you say that you gave it by virtue of the State Building Program? A. I would say perhaps somewhere around ten percent, sir,— ten to fifteen percent, sir.

"Q. In other words, without the State Building Program, it would be about—$60,000 would be your appraisal? A. Somewhere in that neighborhood, sir.

\* \* \* \* \* \*

"May I ask the witness a question, then? Mr. Uselton, disregarding any value that you gave to this property by virtue of the fact that these improvements are being made, what is your opinion as to value—or do you have an opinion as to its value on March 21, 1958, disregarding any increase in value

resulting from the opinions [Improvements]? A. Yes, sir, I do.

\* \* \* \* \* \*

"If he has got an opinion, let him give it. A. About Sixty One or Sixty Two thousand dollars."

Thereafter, the Court instructed the jury to disregard the $73,056 value which Mr. Uselton had previously given.

These proceedings, it seems to us, reflect a very capable and cautious Trial Judge bent on giving the parties exactly what they were entitled to and no more. A witness qualified in these matters by long experience, as Mr. Uselton was, should not be completely disqualified by having considered an improper element of value. It is his ability to adjust himself to the contingencies which arise during the progress of a trial and to reform his opinions in accordance with the rulings of the court which distinguish him as a professional witness in this field.

The State quotes the following testimony of Mr. Uselton to establish that he did not apply the willing seller-buyer test in evaluating this property:

"I did not take into consideration the property being for sale, because it was my understanding that is was not for sale.

"Q. Did you consider that the owner would be willing to sell it? A. No, sir, I did not."

Whatever interpretation might be put on this testimony standing alone, the fact is that it was amplified and explained as the following testimony of Mr. Uselton demonstrates:

"Mr. Kuykendall: Well in arriving at your appraisal, did you take into consideration the fact that the owner would be willing to sell if she could get a price that the purchaser was willing to pay? A. Well, naturally, sir, everybody will be willing to sell a

piece of property for a price, sir, and I knew she, as well as you, or I, or anybody else, owning a piece of property would be willing to sell it if you could get your price for it.

"Mr. Kuykendall: Well, that, in substance, is the definition—the legal definition of market value—there is another element going into it—but that is one of the items. Now, of course, if you did not consider that here was a piece of property that the owner was willing to sell if she could find a buyer that would pay the price that the owner wanted, but neither one of them being compelled to do so, if you didn't use that in arriving at the market value— A. Well, you have got to use that to *derive* at your value.

"Mr. Kuykendall: Well, did you do that in making your appraisal in this case. A. Well, I naturally used the yardstick that she would sell to a prudent buyer when she wasn't being compelled to sell, and that a buyer who was in the need but not having to be compelled would purchase it, yes, sir.

\*   \*   \*   \*   \*   \*

"Mr. Kuykendall: Well, now, just what did you do,—you made an appraisal; now, just what did you take into consideration as the definition of market value? A. The definition of market value is a piece of property being sold by a person you might say desirous or willing—willing to sell, but not having to sell, and being purchased by a buyer who is desirous or willing to buy, but not being compelled to buy. That is true market value, in my opinion.

"Mr. Kuykendall: And is that what you used? A. That is what I used in deriving the value of Mrs. Hartman's property."

Mr. Burns then interrogated the witness as follows:

"Mr. Burns: I am asking you now, then, that in your consideration of the matter here to arrive at an opinion of the value, did you consider this as being a piece of property being offered on the market for sale? A. Yes, sir, you have to do that, Mr. Burns; you have got to derive at true market value—you have got to take into consideration what it would bring, being offered for sale, and being purchased by one who is willing to buy.

"Mr. Burns: That is not the same testimony you gave earlier, is it? A. Well, it is the same testimony I wanted to give, or tried to give.

"Mr. Sandlin: Now, Mr. Uselton, is that still your opinion, that you should not take into consideration the fact that the property was offered for sale, in making your appraisal? A. I think I misunderstood your question a minute ago, in that deriving at a value, true value, of a piece of property, you have got to take into consideration it being offered for sale.

"Q. Now, while ago you were not of that opinion, though, when you testified before this jury? A. Well, I misunderstood your question.

"Q. I see; you just misunderstood. A. Yes, sir."

■■ A witness is not required to be perfect, and if he makes a mistake or is not clear in his testimony, cross-examination and redirect examination is available for correction and explanation. The price of an error thus corrected and explained should not be expunction of the entire testimony of the witness. We believe Mr. Uselton gave a satisfactory explanation of his testimony which the State found objectionable, and that his testimony shows that he understood and applied the proper conception of market value in appraising this property. See State v. Rigby, Tex. Civ.App., 324 S.W.2d 941, 942, Waco Court

of Civil Appeals, writ ref., N.R.E., for a condemnation suit in which the court stated that the evidence as to values was "equivocal", and the opinion evidence as to values "was such that we are unable to clearly compute from it with precision by deliberate and concentrated study," yet the jury verdict was upheld.

Points six, seven and eight are jointly briefed. They present separate and distinct complaints and we will so treat them.

Point six is that the court erred in restricting cross-examination of appellee's witness Crow by the State.

Mr. Crow was asked this question:

"All right, sir. Now, did you make this appraisal of the Ethel Hartman property in the same manner and on the same basis as your appraisals of those properties?"

Appellee's objection that the appraisal of the properties inquired about was not material to this suit was sustained.

The appraisals inquired about were injected into the case by the State on cross-examination of Mr. Crow. They were entirely collateral to the subject matter of this suit.

■■ We believe, as we stated in City of Denison v. Corcoran, Tex.Civ.App., 253 S.W.2d 321, that it is proper cross-examination of an appraiser to show that other similar property had been recently appraised by him, and the result. This was not the purpose of the present inquiry. Only the manner of such appraisal was sought to be ascertained. It is wholly immaterial to this case that Mr. Crow may have improperly appraised other property at other times when there was no effort to use such appraisals to support the appraisal of the subject property. See Richmond v. Hog Creek Oil Co., Tex.Civ.App., 229 S.W. 563, writ of error dismissed, Tex.Com.App., 239 S.W. 904. See also State v. Parrish, 320 S.W.2d 330, Supreme Court, where limiting cross-examination of an appraiser was held not to constitute reversible error. We overrule point six.

■ Point seven is that error was committed in refusing to permit introduction in evidence of a building permit issued by the City of Austin for appellee's premises here involved to rebut her testimony as to claimed improvements to the property.

Appellee testified that she had obtained a permit from the city for repairs and remodeling which she testified were made in 1946. These were more extensive than those described in the permit issued to her by the city on December 13, 1946.

We believe the Court erred in not admitting this evidence. We are of the opinion that the error was not such as requires reversal under Rule 434, Rules of Civil Procedure.

The property was inspected by the State. Its condition was open to view. There was no concealment. This proof would not, in our opinion, have affected the verdict of the jury.

Point eight complains of the action of the Trial Court in refusing to permit the State to offer in evidence abandoned pleadings of appellee to the effect that the subject property had a rental value of $65 per month and a market value of $80,000, when she had testified to a rental value of $75 per month and a market value of $100,000.

Appellee concedes this was error, but asserts it was harmless error. We agree. Rule 434, supra.

Point nine is that the Trial Court erred in overruling the State's objection to appellee's pleading that "she provided for herself an apartment in said house in which she lived and called her home," for the reason that the sole purpose of the allegation was to appeal to the sympathy of the jury.

We do not find that this pleading was read to the jury, or that if read there was objection. Since, however, the substance·

of the complaint is included in the points regarding improper jury argument, we will let our ruling there apply to this point.

■ Points ten, eleven and twelve relate to jury argument of appellee's counsel. The argument complained of, the objections of counsel and ruling of the court follow:

"I have been practicing law more than thirty three years, and I don't recall a case where in my opinion a woman or a person has been treated as unfairly as the State of Texas has attempted to treat Mrs. Hartman in this case. From this evidence from the witness stand I think you must have sensed that the State of Texas has been mistreating others, too, because Mr. Legge testified that out of about twenty-eight appraisals he made that about a dozen of them have gone to court. I think—

"Mr. Burns: Your Honor, I am going to object to that line of argument as appealing to the emotions of the jury to create prejudice against the State of Texas with not one single word that he has said having any bearing on the issue of market value. I would like for the jury to be instructed to disregard that argument.

"Mr. Kuykendall: If the Court please, that testimony came in unobjected to; it is in the record; and I have got a right to refer to it.

"The Court: I will overrule the objection, but with this qualification; I believe Mr. Legge's testimony was not that these cases were taken to court by the landowners. He just meant that that many cases are on the docket without respect to which side did the appealing.

"Mr. Kuykendall: Well,—

"The Court: It was his statement that there were about that many cases that have been appealed.

"Mr. Kuykendall: In which he had prepared appraisals.

"The Court: That's right.

"Mr. Burns: The Court overrules my objection?

"The Court: I overrule your objection with that explanation.

\*      \*      \*      \*      \*      \*

"If the Court please, and Ladies and Gentlemen of the Jury, I don't mind my friend, Bob Burns,—Mr. Burns from Houston, criticizing me for what I might have said. He has the job of trying to uphold his own witnesses, just like I have the job of trying to uphold our appraisers. He has the job of upholding a man who at least twelve out of his twenty-eight appraisals have been brought in question by the people, by the owners; and you remember that.

\*      \*      \*      \*      \*      \*

"That (requirement that party condemning must pay just compensation) applies to everybody. Whether the agency that takes the property is big, strong, weak, or otherwise, and also it means that every person who owns property that is being taken by the State has an absolute right to be safeguarded and to obtain for that property the reasonable—the market value of it, or just compensation for it. Yes, the great State of Texas can by force, if necessary, dispossess you of your property even if it is your home, as it happened in this case.

\*      \*      \*      \*      \*      \*

"More than forty years ago Mrs. Hartman came to Austin, Texas with three children—

"Mr. Burns: Now, if the Court please, I am going to object to that as being a direct appeal to the sympathy of the jury,—irrespective of when Mrs. Hartman came to Austin, or reared her children, or what not, that can have

nothing to do with the market value of this property.

"Mr. Kuykendall: If the Court please, I have got a right to discuss the testimony here; and the jury will be governed by the Court's charge.

"Mr. Burns: But the Court has instructed the jury that they will not let sympathy or any other emotion—

"Mr. Kuykendall: And I object to counsel interrupting me during the course of my argument to make a little speech himself.

"The Court: The objection will be overruled.

"Mr. Burns: I object to it further that it is contrary to the Court's charge, that they will not let sympathy or any other emotion—

"The Court: And that charge to the jury still stands.

"Mr. Burns: I understand, but I am objecting that counsel's argument is contrary to the Court's charge.

"Mr. Kuykendall: He is using my time, Your Honor.

"The Court: The objection will be overruled.

"Mr. Burns: Well, I will not use any more of his time if he will agree that I can make my objections to the Court Reporter after he finishes his argument.

"Mr. Kuykendall: No, you make them, but I want you using—on your own time.

"Mr. Burns: All right.

"Mr. Kuykendall: Now, before I was interrupted, and I think you have got the right to consider all the facts in the case. Mrs. Hartman came to Austin, a widow, with three children. She reared those children; she be-

came a nurse and worked in hospitals, and for private people, and educated those children,—all three of them finished high school, and I believe one of them finished the University. She saved enough money, or she had enough money, to buy this property in February, 1946. When she bought this property I am quite sure that little did she realize that after she had owned it approximately ten years, that this great State of Texas of ours—and I am a native Texan, and I am proud of our State, but I don't think the State ought to take advantage of the people and not pay them what their property is worth—little did she realize that after she had acquired this property, that the State would exercise the power and take it away from her. I can imagine that when she acquired this property she thought, 'This will be a good income property, and I can live on it the balance of my days; I will never be a burden on society, and I will not be a burden on my children.' I know that she is proud of her children, just like they are of her, of what she has accomplished."

And in his closing argument appellee's counsel stated:

"So I hope that in your deliberations that you will not lean backwards against Mrs. Hartman because she has had the struggle that she has had, and she has accumulated what she had, and because she was one of twelve dissatisfied person with Mr. Legge's appraisals."

Mr. Legge testified, without objection, that out of twenty eight pieces of property which the State acquired under its building program on which he made appraisals, "Roughly, it seems that there was probably ten or twelve" in which suits were filed.

Appellee was sued as a "widow." She testified to the following, without objection:

That she was 72 years of age, a widow for 40 years. She had three children, two daughters and a son. She reared and educated her children. She moved from Taylor to Austin about 40 years ago. She was a nurse, working at various places. She made the money which went into the purchase of this property by "working, nursing." As previously stated, appellee testified that she lived in the house as her home, occupying a unit consisting of four rooms and a bath.

We believe the above argument to be a fair comment on the evidence introduced and the nature of the case pleaded. It was strong argument, but in essence it simply called upon the jury to deal fairly with a humble citizen who involuntarily, but for the public welfare, surrendered her property to the State.

Finding no reversible error, the judgment of the Trial Court is affirmed.

Affirmed.

### On Appellant's Motion for Rehearing

In our opinion we stated that in overruling the point that the jury verdict was against the weight of the evidence we had considered all the evidence relied upon by the State to sustain this point. We then proceeded to give the substance of this evidence as found in the brief for the State.

The State now complains that we did not, in deciding this point, consider the evidence which its counsel made use of in orally arguing the case upon submission, a summation of which was later filed.

We did consider such evidence and all the evidence, but since the State did not deem it of sufficient importance to include the evidence referred to in its brief we did not deem it of sufficient importance to include it in our opinion.

The motion is overruled.

Motion overruled.